AO 108 (Rev. 06/09)  Application for a Warrant to Seize Property Subject to Forfeiture

# UNITED STATES DISTRICT COURT
### for the
### District of Colorado

| | |
|---|---|
| In the Matter of the Seizure of<br>*(Briefly describe the property to be seized)*<br><br>2016 Mercedes GLC Utility Passenger Car, VIN<br>#WDC0G4KBXGF051587 | )<br>)<br>)  Case No.  19-mc-00117-MEH<br>)<br>) |

## APPLICATION FOR A WARRANT
## TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, a federal law enforcement officer or attorney for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property in the _____ District of _____Colorado_____ is subject to forfeiture to the United States of America under ___18___ U.S.C. § 981(a)(1)(C)_____ *(describe the property)*:

2016 Mercedes GLC Utility Passenger Car, VIN #WDC0G4KBXGF051587

The application is based on these facts:

The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are set forth in the attached affidavit which is continued on the attached sheet and made a part hereof.

☑ Continued on the attached sheet.

_____
s/Raul Leon
*Applicant's signature*

_____
Raul Leon, FBI Special Agent
*Printed name and title*

Sworn to before me and:☐ signed in my presence. ☒ submitted, attested to, and acknowledged by reliable electronic means.

Date:  ___11/15/2019___

_____
*Michael E. Hegarty*
*Judge's signature*

City and state:  ___Denver, Colorado___

Michael E. Hegarty, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEIZURE WARRANTS**

I, Raul Leon, being duly sworn, depose and state the following is true to the best of my information, knowledge, and belief:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been since 2004. I have been assigned to the Complex Financial Crimes Squad with primary investigative responsibilities involving criminal matters particularly related to economic or white-collar crime since 2016. I have participated in several fraud investigations, with many of those investigations involving wire fraud, mail fraud, money laundering, investment fraud, and corporate fraud.

2. The FBI is investigating Robert Martinez ("Martinez") and Wahid Benabbas ("Benabbas"), and others known and unknown for, among other things, wire fraud, in violation of 18 U.S.C. § 1343, and conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371.

3. This affidavit supports applications for seizure warrants for the following bank accounts and assets:

    a. All funds in U.S. Bank account #103681420248 in the name of Epsilon Controls LLC;

    b. 2016 Chevrolet Corvette, VIN #1G1YY26U065124386;

    c. 2010 Chevrolet Avalanche, VIN #3GNVKGE06AG224170;

    d. 2016 Harley Davidson Motorcycle FLTRXS, VIN #1HD1KTM11GB638225;

    e. 2016 Mercedes GLC Utility Passenger Car, VIN #WDC0G4KBXGF051587;

    f. 2016 Toyota Highlander, VIN #5TDJKRFH5GS232634; and

    g. 2017 Toyota RAV4, VIN #JTMDJREV1HD108249.

4. The facts set forth in this affidavit are based upon my personal observations and review of records, my training and experience, written reports, information obtained by other FBI case agents, FBI financial investigators, and investigators at Kaiser Permanente ("KP") into this criminal matter. This affidavit is intended to show that there is probable cause for the requested seizure warrants and does not purport to set forth all of my knowledge of, or investigation into, this matter.

5. Your affiant submits that there is probable cause to believe that: (a) Martinez and Benabbas have committed wire fraud and conspired to commit wire fraud, (b) the

1

funds in the aforementioned bank account and the aforementioned six vehicles are subject to seizure and forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C), as property which constitutes or is derived from proceeds traceable to one or more violations of 18 U.S.C. §1343 (wire fraud).

## BACKGROUND INFORMATION

6.  KP is a United States-based managed care consortium based in Oakland, California, serving 12.3 million members in 8 states and the District of Columbia.  KP's Colorado Region is comprised of approximately 54 medical and administrative buildings whose infrastructure is maintained by approximately 32 building engineers and supervisors.  This consists of three teams, or hubs, of building engineers each led by a hub supervisor.

7.  KP's Colorado region had been renovating and updating the Building Automation Systems ("BAS") that serve to monitor and control the Heating, Ventilation, Air Conditioning ("HVAC"), lighting, security, and similar systems of each KP building.  The BAS is a "smart" system of electronic components that can be accessed remotely via network by authorized engineers and maintenance technicians to monitor and control building systems.  An essential component of a BAS is the Java Application Control Engine ("JACE") controller, which is used to communicate with other electronic and mechanical components within the building.

8.  Martinez had been employed with KP since approximately November 1988.  He held the position of Chief Engineer starting in approximately January 2006. As the Chief Engineer and as an assigned Project Engineer, Martinez evaluated proposals from vendors, selected the appropriate vendor for the job, submitted the purchase order to the KP purchasing department for processing, and often approved invoices for payment.  In June 2018, Martinez was promoted to Construction Staff Project Manager for KP's National Facility Services ("NFS").  In addition to his duties as Construction Staff Project Manager, Martinez reassumed the responsibilities of Chief Engineer from August 2018 through October 2018.

9.  Benabbas had been employed by KP as a Senior Consultant of Maintenance Services for KP's NFS-Facility Operations Security and Energy since approximately November 2007.  Benabbas' duties included supervising the BAS for KP in the Colorado Region.  He was also assisting KP with upgrading the current BAS system in Colorado as well as other regions outside of Colorado.

10. Martinez and Benabbas were both exempt salaried employees of KP and were not eligible for overtime pay.

11. In July 2018, KP received a tip on KP's National Compliance Fraud Hotline from an anonymous caller who alleged Martinez had improper vendor relationships and was receiving kickbacks from the vendors he approved to work at KP facilities. The caller also alleged Martinez was operating his own private business and felt this was a

2

conflict of interest.  The caller stated KP building engineer Benabbas may be doing consulting work for Martinez.  KP conducted an internal investigation of the allegations reported.

Entities Involved in the Scheme

12. According to the Colorado Secretary of State, Epsilon Controls, LLC ("Epsilon Controls") was formed by Martinez and Benabbas on October 23, 2013.  Corporate documents listed Benabbas as the person forming the LLC and Martinez as an additional organizer.

13. KMG is a small, Colorado-based company with six employees.  KMG had been an approved vendor for KP since 2003.  Mark Garrett ("Garrett") was KMG's President. KMG maintained multiple electrical service work and HVAC related contracts with KP throughout the years. A signed contract between KMG and KP, valid from 1/28/2016 through 1/27/2019, stated that KMG's scope of services were related to electrical work.

14. Ultra Temp is a small, Colorado-based HVAC and refrigeration service company that was owned and operated solely by Salvatore "Mike" Iacovetta ("Iacovetta"). Ultra Temp was an approved vendor for KP since 2007.  KP contracted with Ultra Temp to perform regular maintenance on ice machines and certain refrigeration units as well as refrigeration and HVAC repairs as needed for buildings in KP's Colorado region. Martinez and Iacovetta were personal friends for approximately 8 years.[1]

KP Policies

15. KP has a documented Vendor Relationships policy that prohibits the following vendor relationships: (1) employees may not be a supplier/vendor to KP while employed by KP, (2) employees may not also be employed by suppliers/vendors to conduct work for KP or at a KP facility, and (3) employees may not also be contractors to suppliers/vendors for contracts or assignments where the customer or the client is KP.  In addition, KP required certain employees to annually review and sign a Conflict of Interest Questionnaire.  Vendors were also required to comply with the signed Service Agreements, which included the Vendor Code of Conduct.

16. KMG's and Ultra Temp's Service Agreements both included a section labeled "Accepted Subcontractors and Schedule of Values".  The section included the

---

[1] During an October 2, 2018, interview of Martinez by KP Investigators, Martinez stated that he had gone to high school with Iacovetta's wife and had known Iacovetta for approximately 8 or 9 years. Both Martinez and Iacovetta were working on a vehicle together at Iacovetta's house. Iacovetta and Martinez messaged each other regarding golf outings, purchasing vehicle parts, and attending other social events together.

following language: "For each Services Order[2], Contractor shall attach a list of selected subcontractors and the accepted cost of their work for their respective portions of the Services. The costs listed thereon shall also constitute an accepted schedule of values.  Contractor shall not enter into a subcontract with any subcontractor other than those listed on the each Services order, except with prior written approval of Kaiser."

17. KP also required contractors to comply with additional guidelines, to include the KP Vendor Code of Conduct which contains the minimum standards by which each supplier is expected to conduct itself when providing services to KP. Under the KP Vendor Code of Conduct, dated October 2011, December 2015 and September 2016, which is required and referenced in the Service Agreements with KMG and Ultra Temp, it states the conflict of interest between a vendor and KP personnel, or the appearance thereof, should be avoided. It further states that when an actual, potential, or perceived conflict of interest occurs, that conflict must be disclosed, in writing, by the vendor to a person of authority at KP other than the person who has the relationship with the vendor. KP Personnel are not permitted to work for a vendor if KP is the client. Garrett and Iacovetta were aware the Martinez and Benabbas worked for KP and that there was a conflict of interest, yet they did not disclose this to KP as required[3].

18. According to KP's Conflict of Interest Policy, all employees were required to promptly disclose any situations that may present a conflict of interest or the appearance of a conflict of interest.

19. Martinez and Benabbas both completed KP Conflicts of Interest Questionnaires annually for years 2014 through 2017. Questions in the questionnaire include the following: a) Have you held a paid position for a competitor or Vendor of KP as a management employee, a consultant or independent contractor; b) If you have control or influence over transactions with KP customers or suppliers, have you or any family member held financial interest with those companies or their competitors during the last 12 months; c) Are you aware of any actual or potential conflicts of interest other than those disclosed in this questionnaire.  Martinez and Benabbas responded with "No" for all questions and did not disclose their ownership or affiliation with Epsilon Controls, or any other potential conflicts of interest, in any of the Questionnaires they submitted from 2014 through 2017.

20. The approval process for capital projects[4] was dependent on the dollar amount of the project.  According to a KP Senior Finance Manager, capital projects under

---

[2] Within the contract, KP states each work assignment is deemed a "Request for Service" or "Services Order".

[3] In the Vendor Service Agreement for both Ultra Temp and KMG, Martinez and Benabbas were the first KP employees listed in the KP Colorado engineer contact list.

[4] KP considered capital projects in the Colorado region to be anything under $1.5 million that was not related to plant maintenance or plant renovation.

$250,000 could be approved by the Executive Director.  This typically happened via OneLink, a software program used by KP.  If the project was over $500,000, additional approvals would be required from higher authorities.  KMG was used on a number of capital projects throughout the region.

21. Both Ultra Temp and KMG had "blanket purchase orders" which allowed them to do work for KP on an "as needed" basis for projects throughout the region.  Their invoices were submitted to Accounts Payable in Colorado and then routed to the Engineer Supervisor.  If the invoice amount exceeded $2500, the invoice was passed up to Martinez for approval.  By authorizing the payment of the invoice, the approver validated that the work was completed.

## INVESTIGATION OF MARTINEZ AND BENABBAS BY KP

22. On October 2, 2018, KP Investigators interviewed Robert Martinez. Martinez stated that Epsilon Controls was a company that he initiated by himself in 2013. But he later stated that he formed and owned Epsilon Controls jointly with Benabbas. Martinez stated that Epsilon Controls used KP vendors Ultra Temp and KMG as pass-through vendors to obtain funds from KP. Martinez stated he knew this was wrong. Because Martinez had inside information about every KP project, Martinez stated that it was not appropriate for him to help a vendor submit proposals for KP projects. Martinez helped Ultra Temp owner Iacovetta write the scope to an undated proposal involving the purchase and installation of JACE controllers.

23. Martinez further stated that the purchase of 100 JACE controllers in December 2016 was one of the projects managed by Epsilon Controls, with the charges passed through by KMG.  Martinez stated the 100 JACE controllers were purchased with end of year capital funds and were to be used to upgrade facilities in the Colorado Region.  He could not recall if they solicited other bids for the project as required by KP policy. Martinez stated that the $6,000 price for each JACE controller represented a significant cost saving for KP because Benabbas would be doing the installation[5]. In addition, Martinez stated this arrangement allowed him to make money. Martinez stated he verified that all 100 JACE controllers were delivered when he approved the payment of the invoice. He was unable to confirm all 100 JACE controllers were installed. He explained that KMG did not have anything to do with the project other than to prepare the proposal and submit the invoice. Martinez estimated that KMG kept approximately $10,000 of the $621,000 that was billed to KP.  Martinez admitted that only 70 or 80 of those JACE controllers were installed as of the date of his interview.

24. Martinez stated that transactions involving Ultra Temp and KMG in which Epsilon Controls was involved were transactions where Ultra Temp and KMG had acted as a pass-through vendor to Epsilon Controls.  Martinez stated that KMG issued an

---

[5] Although the invoice associated with the 100 JACE controllers did not break out a labor charge, KP was billed for labor associated with JACE controllers on other invoices in this scheme.

invoice to KP for payment and KP paid KMG. After receiving payment from KP, KMG would keep some of the funds as payment for their help in the transaction before issuing a check to Epsilon Controls.

25. Martinez was not able to provide any names of other Epsilon Controls customers.

26. On October 3, 2018, Wahid Benabbas was interviewed by KP Investigators. Benabbas confirmed he and Robert Martinez owned Epsilon Controls. Martinez filed the paperwork required to start the business and thought owning the business might be a "compliance issue" with KP.

27. Benabbas and Martinez worked with authorized KP vendors Ultra Temp and KMG to bill KP for work completed by Epsilon Controls so that it would look like KMG and Ultra Temp had completed the work. Epsilon Controls was able to acquire the JACE controllers at a significantly lower price than the authorized vendors working on the BAS. KMG and Ultra Temp would keep 10 percent or less of the invoiced amount, depending on what Martinez had negotiated with them.

28. Benabbas stated the usual method for obtaining BAS system solutions for KP was to request three or four bids from different vendors before selecting a vendor for the job. Martinez handled the paperwork for the projects, which entailed soliciting and approving the bid proposals submitted by KP's authorized vendors. Martinez and Benabbas were able to ensure their bid was lower than other vendors because they knew what the other vendors were charging to do the work. After the proposal was approved, Benabbas, through Epsilon Controls, was to provide and install the JACE controllers called for in the job proposal. Ultra Temp or KMG then sent a billing invoice to the KP Colorado Region accounts payable department. Once paid, KMG or Ultra Temp would write a check to Epsilon Controls for the amount of the bid proposal less their negotiated fee. KMG provided limited assistance, such as cabling or running wires, in the installation of the controllers.

29. Benabbas wrote the proposal for submission to KP management for the 100 JACE controllers. Benabbas stated that there never was a delivery of 100 JACE controllers as described in the proposal and invoice. Benabbas purchased the controllers over a period of time. Benabbas purchased approximately 20 JACE controllers from a legitimate United States supplier, Wilson-Mohr. He purchased another 60 JACE controllers in Canada and France at flea markets and through off-market deals. He obtained some of these controllers for free, but he said the average price he paid was about $3,000 to $4,000[6]. Benabbas stated that he bought the controllers outside of the normal supply chain, modified controllers to circumvent licensing requirements, and programmed and installed the JACE controllers. Benabbas described this as a "win-win" situation because KP received parts and service at a reduced cost and Epsilon Controls could make "tons of money."

---

[6] According to Invoice #12-091880, KP was charged $6,000 per JACE controller. Benabbas said that vendors charged $15,000 to $18,000 for these same controllers.

Benabbas said he replaced about 56 or 57 JACE controllers in KP buildings and said there were 46 or 47 controllers in his personal vehicle.  He provided these remaining controllers to KP after the October 3, 2018 interview.

30. Benabbas was not able to provide any names of other Epsilon Controls customers.

31. On October 2, 2018, KP Investigators interviewed Iacovetta, owner of Ultra Temp. He said that Martinez and Benabbas provided Iacovetta with instructions on what parts to order and list on his invoices.  He understood that the parts would be installed in KP buildings by Epsilon Controls, which was owned by Martinez and Benabbas.  Iacovetta stated that he did not know how to install any of the ordered items as his specialty is HVAC and refrigeration. Iacovetta had nothing to do with the JACE parts.  Iacovetta was told he could keep 10% of the amount he billed KP. He stated that he would write checks back to Epsilon Controls based on instructions from Martinez. He had no idea if Epsilon Controls actually performed the work for the parts that he ordered.

32. On October 2, 2018, Garrett, President of KMG, was interviewed by KP Investigators. Garrett said that he met Martinez in 1999 and described their relationship as strictly business. Garrett stated there were multiple HVAC-related contracts in the past few years in which Martinez instructed Garrett to utilize the subcontractor Epsilon Controls. Garrett had not done business with Epsilon Controls outside of a KP contract.  It was Garrett's understanding that Epsilon Controls did not have a contractual relationship with KP. Martinez was Garrett's point of contact on all the projects where KMG utilized Epsilon Controls as a subcontractor. Martinez provided Garrett with Epsilon Control's fees for the specific contract, usually by email. Garrett included Epsilon Control's fees in his KP proposal and subsequent invoice. Garrett submitted his proposals and invoices directly to Martinez in the form of a Word document.  He recalled that on at least one occasion, Martinez reworded his invoice and sent it back to him.  Martinez told Garrett that Epsilon Controls would procure certain parts needed for the contract. Once KP paid KMG's invoice, Garrett met with Martinez in person to pay Epsilon Controls by check.  At the same time, Martinez provided him with an Epsilon Controls invoice.  Garrett denied knowing that Epsilon Controls was controlled by Martinez and Benabbas.

33. During the KP investigation, KP found and collected relevant records from the KP computers used by Martinez and Benabbas, including Epsilon Controls bank statements, tax documents, emails, and copies of checks. As a result of KP's investigative findings, on October 12, 2018, Martinez and Benabbas were terminated by KP.  KP had also suspended future projects and work orders with Ultra Temp and KMG.

## BANK ACCOUNTS AND CREDIT CARDS UTILIZED IN THE SCHEME

**U.S. Bank Account 103681420248 (0248) in the name of Epsilon Controls, LLC**

34. On January 31, 2014, U.S. Bank account ending in 0248 was opened in the name of

Epsilon Controls, LLC.  The signors on the account were Benabbas and Martinez. This account was solely used as an operating account for Epsilon Controls.

**J.P. Morgan Chase (Chase) Bank Account 635604315 (4315) in the name of KMG Electric Inc. (KMG)**

35. On February 27, 2008, Chase account ending in 4315 was opened in the name of KMG.  The signors on the account are Linda L. Garrett and Mark Garrett.  This is a vendor business checking account.

**BBVA Compass Bank (BBVA) Account 2503184349 (4349) in the name of Ultra Temp, Inc. (Ultra Temp)**

36. On September 29, 2003 account ending in 4349 was opened in the name of Ultra Temp.  The signor on the account was Salvatore M. Iacovetta.  On March 5, 2004 Sabrina M. Iacovetta was added as a signor to the account.  This is a vendor business checking account.

**U.S. Bank Account 203681000915 (0915) in the name of Wahid Benabbas**

37. On October 2, 2001, U.S. Bank account ending in 0915 was opened in the name of Wahid Benabbas, the sole signor on the account.  This account received funds from Epsilon Controls operating account ending in 0248.

**U.S. Bank Account 103671824078 (4078) in the name of Wahid Benabbas**

38. On May 10, 2001, U.S. Bank account ending in 4078 was opened in the name of Wahid Benabbas, the sole signor on the account.  This account received funds from Epsilon Controls operating account ending in 0248.

**U.S. Bank Account 103673466043 (6043) in the name of Wahid Benabbas and Fatima Azmi**

39. On January 14, 2003, U.S. Bank account ending in 6043 was opened in the name of Wahid Benabbas and Fatima Azmi, both signors of the account.  This account received funds from Epsilon Controls operating account ending in 0248.

**U.S. Bank Account 103679215394 (5394) in the name of Robert Martinez**

40. On June 1, 2009, U.S. Bank account ending in 5394 was opened in the name of Robert Martinez, the sole signor on the account.  This account received funds from Epsilon Controls operating account ending in 0248.

**U.S. Bank Account 237801131101 (1101) in the name of Robert Martinez Cust for Robert Persichitte**

41. On February 26, 1992, U.S. Bank account ending in 1101 was opened in the name

of Robert Martinez Cust for R.P.[7], with Robert Martinez as the sole signor on the account.  This account received funds from Epsilon Controls operating account ending in 0248.

**U.S. Bank Credit Card Account 4798531212865101 (5101) in the name of Epsilon Controls LLC - Accounts Payable and 4798531212865119 (5119) in the name of Epsilon Controls LLC Robert A. Martinez[8].**

42. On January 31, 2014, U.S. Bank credit card account ending in 5101 and 5119 was opened in the name of Epsilon Controls LLC - Accounts Payable and Epsilon Controls LLC Robert A. Martinez, respectively.  The credit card ending in 5101 is the main card account for Epsilon Controls and is also the accounts payable account. Account 5119 was issued for Robert Martinez to use; all of the transactions made by Robert Martinez with the credit card ending in 5119 also appears on the main credit card account 5101.  Epsilon Controls made payments on credit card account 5119 transactions through the main card accounts payable account, 5101 from Epsilon Controls operating account ending in 0248.

**U.S. Bank Credit Card Account 4227448565127438 (7438)[9] in the name of Robert Martinez**

43. On August 1, 2015, U.S. Bank credit card account ending in 7438 was opened in the name of Robert Martinez, the sole signor on the account.  This account received funds from Epsilon Controls operating account ending in 0248.

**U.S. Bank Credit Card Account 4359830002637576 (7576)[10] in the name of Robert Martinez**

44. On August 13, 2009, U.S. Bank credit card account ending in 7576 was opened in the name of Robert Martinez, the sole signor on the account.  This account received funds from Epsilon Controls operating account ending in 0248.

### ANALYSIS OF FINANCIAL RECORDS

45. Case agents and FBI Financial Investigators have reviewed the Ultra Temp invoices and financial records and learned the following:

   a. From September 22, 2014, to June 2, 2016, Ultra Temp submitted five invoices to KP for $283,925.  Below is a detail of the invoices:

---

[7] R.P. is a minor child on this account.
[8] Possible purchases of parts used for KP projects charged to this credit card.
[9] This credit card was used by Robert Martinez to purchase the 2010 Chevrolet Avalanche.
[10] This credit card was used by Robert Martinez to purchase the 2010 Chevrolet Avalanche.

| Invoice Date | Invoice Number | Amount Billed | Description (Summarized) |
|---|---|---|---|
| 9/22/2014 | 54172 | $53,250 | Parts and Materials for Baseline Project |
| 9/22/2014 | 54172-2 | $18,750 | Install, Programming, Configuration and Commissioning of Baseline Project |
| 11/21/2014 | 54201 | $37,775 | Software Upgrade, Graphic Design and Troubleshooting |
| 11/21/2014 | 54202 | $152,150 | Materials and Labor for Skyline Project |
| 6/2/2016 | 54410 | $22,000 | Programming and Mapping of 4 JACE Controllers |
| **Total** | | **$283,925** | |

b.  These invoices all appear to include a labor component although it's not broken out in the invoice with the exception of Invoice 54202, which listed the labor amount of $27,500.  If this work was completed, it was likely completed by Benabbas, who is a salaried employee of KP and not eligible for overtime pay.

c.  The BBVA Bank Account in the name of Ultra Temp ending in 4349, along with records provided by KP, show that KP paid the above Ultra Temp invoices in full as reflected in the chart below:

| Payment Date | Payment Amount | Related Invoice | Deposited to Account |
|---|---|---|---|
| 9/29/2014 | $53,250 | 54172 | Ultra Temp 4349 |
| 11/19/2014 | $18,750 | 54172-2 | Ultra Temp 4349 |
| 1/30/2015 | $152,150 | 54202 | Ultra Temp 4349 |
| 2/17/2015 | $37,775 | 54201 | Ultra Temp 4349 |
| 8/31/2016 | $22,000 | 54410 | Ultra Temp 4349 |
| **Total** | **$283,925** | | |

d.  The BBVA Bank Account in the name of Ultra Temp ending in 4349 and the U.S. Bank account in the name of Epsilon Controls ending in 0248 show the

following payments by check[11] from Ultra Temp to Epsilon Controls:

| Payment Date | Payment Amount | Payment From | Deposited to Account |
| --- | --- | --- | --- |
| 1/31/2014 | $1,400 | Ultra Temp 4349 | Epsilon Controls 0248 |
| 4/10/2014 | $2,200 | Ultra Temp 4349 | Epsilon Controls 0248 |
| 10/15/2014 | $53,000 | Ultra Temp 4349 | Epsilon Controls 0248 |
| 11/26/2014 | $4,750 | Ultra Temp 4349 | Epsilon Controls 0248 |
| 12/10/2014 | $13,750 | Ultra Temp 4349 | Epsilon Controls 0248 |
| 2/20/2015 | $143,500 | Ultra Temp 4349 | Epsilon Controls 0248 |
| 3/11/2015 | $34,375 | Ultra Temp 4349 | Epsilon Controls 0248 |
| 4/23/2015 | $3,675 | Ultra Temp 4349 | Epsilon Controls 0248 |
| 9/16/2016 | $20,000 | Ultra Temp 4349 | Epsilon Controls 0248 |
| **Total** | **$276,650** | | |

    e.  The first two payments listed in the above table occured prior to the first known invoice to KP from Ultra Temp involving Epsilon Controls work.

46. Case agents and FBI Financial Investigators have reviewed the KMG invoices and financial records and learned the following:

    a.  From October 26, 2015 to July 25, 2018, KMG submitted nine invoices to KP for $1,420,598.  Below is a detail of the invoices:

| Invoice Date | Invoice Number | Amount Billed | Description (Summarized) |
| --- | --- | --- | --- |
| 10/26/2015 | 12-091691 | $17,740[12] | Design, Graphics and Programming. Includes Installation of Parts and Design Labor |
| 7/27/2016 | 12-091825 | $126,963 | Parts for Englewood Project |

---

[11] All checks were endorsed by Martinez except for the payment dated 4/23/2015 for $3,675 which was stamped and not signed.

[12] Total labor for invoice #12-091691 was $6,300.

| 8/26/2016 | 12-091831 | $40,245[13] | Labor for Englewood Project |
| 12/22/2016 | 12-091880 | $621,900[14] | 100 JACE Controllers and Sales Tax |
| 5/11/2018 | 12-092143 | $58,500[15] | 5 JACE Controllers and Labor |
| 5/11/2018 | 12-092142 | $73,250[16] | 5 JACE Controllers and Labor |
| 6/18/2018 | 12-092171 | $184,000 | Parts for Ken Caryl Project |
| 7/24/2018 | 12-092204 | $66,000[17] | Labor for Ken Caryl Project |
| 7/25/2018 | 12-092205 | $232,000 | Parts for Highlands Ranch Project |
| **Total** | | **$1,420,598** | |

b.  The total amount of labor broken out in the above invoices was approximately $127,295.  If this work was completed, it was likely completed by Benabbas, who is a salaried employee of KP and not eligible for overtime pay, or KMG when it involved electrical work.

c.  Notably, all the invoices listed above are under $250,000 with the exception of invoice 12-091880.  On December 29, 2016, Martinez approved invoice 12-091880 in an email with the text "yes okay to pay" after being asked if all 100 of the JACE controllers had been delivered.

d.  Chase bank account in the name of KMG ending in 4315, along with records provided by KP, show that KP paid the above KMG invoices in full as reflected in the chart below:

| Payment Date | Payment Amount | Related Invoice | Deposited to Account |
| --- | --- | --- | --- |
| 11/25/2015 | $17,740 | 12-091691 | KMG 4315 |
| 8/26/2016 | $126,963 | 12-091825 | KMG 4315 |
| 9/23/2016 | $40,245 | 12-091831 | KMG 4315 |
| 1/20/2017 | $621,900 | 12-091880 | KMG 4315 |

[13] Total labor for invoice #12-091831 was $40,245.
[14] This project would have been considered a capital project as discussed above.
[15] Total labor for invoice #12-092143 was $6,500.
[16] Total labor for invoice #12-092142 was $8,250
[17] Total labor for invoice #12-092204 was $66,000.

| 6/11/2018 | $58,500 | 12-092143 | KMG 4315 |
| 6/11/2018 | $73,250 | 12-092142 | KMG 4315 |
| 7/19/2018 | $184,000 | 12-092171 | KMG 4315 |
| 8/24/2018 | $66,000 | 12-092204 | KMG 4315 |
| 8/27/2018 | $232,000 | 12-092205 | KMG 4315 |
| **Total** | **$1,420,598** | | |

e. Chase bank account in the name of KMG ending in 4315 and U.S. Bank account in the name of Epsilon Controls ending in 0248 show the following payments by check[18] from KMG to Epsilon Controls:

| Payment Date | Payment Amount | Payment From | Deposited to Account |
| --- | --- | --- | --- |
| 12/18/2015 | $10,000 | KMG 4315 | Epsilon Controls 0248 |
| 9/29/2016 | $121,250 | KMG 4315 | Epsilon Controls 0248 |
| 10/21/2016 | $30,625 | KMG 4315 | Epsilon Controls 0248 |
| 2/15/2017 | $590,000 | KMG 4315 | Epsilon Controls 0248 |
| 3/6/2018 | $6,086 | KMG 4315 | Epsilon Controls 0248 |
| 6/26/2018 | $123,750 | KMG 4315 | Epsilon Controls 0248 |
| 8/23/2018 | $176,535 | KMG 4315 | Epsilon Controls 0248 |
| **Total** | **$1,058,246** | | |

47. The bank records do not show payments from KMG to Epsilon Controls after August 23, 2018. KMG likely did not pay Epsilon Controls for Invoices 12-092204 and 12-092205 above.

48. A total of $1,704,523 was invoiced by KMG and Ultra Temp and paid by KP. A total of $1,334,896 was paid to Epsilon Controls by KMG and Ultra Temp as detailed in the tables above.

**KP's REVIEW OF BAS SYSTEMS**

---

[18] All checks were endorsed by Martinez.

49. In October 2018, KP initiated a review of their BAS systems to determine if any of the work invoiced by KMG and Ultra Temp in the tables above was completed by Epsilon Controls. KP concluded their review in November 2019. The results of their review are as follows[19]:

   a. KP was billed for and paid approximately $772,500[20] for approximately 132 JACE controllers through Ultra Temp and KMG.  After reviewing their network, they found approximately 42 to 46 of these JACE controllers were actually installed at KP.

   b. KP was billed for and paid approximately $734,353[21] for other parts.  Due to the vague descriptions in the invoices, KP was unable to determine which parts were received on several of the invoices.  For the five invoices where other parts were clearly itemized, KP found that in three invoices, no parts were received and in two invoices only a portion of parts were received. For one of the invoices, KP stated that the work was completed by a different vendor.

   c. KP was billed for and paid approximately $175,770 in labor.  If any of this work was completed, it was likely completed by Benabbas, who is a salaried employee of KP and not eligible for overtime pay, or KMG when it involved electrical work.

**FLOW OF FUNDS**

50. Between January 31, 2014 and October 31, 2018, approximately $1,334,896 was deposited into Epsilon Controls U.S. Bank account ending in 0248 from KMG and Ultra Temp.  During that same timeframe, the only other deposits were approximately $28,136[22,] for a total of approximately $1,363,032 deposited in the Epsilon Controls U.S. Bank account ending in 0248. There were no other significant deposits were made into U.S. Bank account ending in 0248 between January 31, 2014 and October 31, 2018 other than the deposits from KMG and Ultra Temp.

   a. Of the approximately $1,363,032 that was deposited into Epsilon Controls

---

[19] The numbers below do not included $21,900 charged for sales tax.
[20] There were at least four invoices that did not itemize the cost charged for the JACE controller and therefore were not included in this amount.
[21] This amount may include cost charged for JACE controller when parts charged were not itemized.
[22] This includes approximately $7,276 that was deposited into the Epsilon Controls account and withdrawn on the same day. In addition, there was $20,860 transferred from Martinez's and Benabbas' personal accounts, of which approximately $20,000 was transferred out on the same day.

U.S. Bank account ending in 0248, approximately $956,000[23] was transferred to either Martinez's or Benabbas' personal U.S. Bank accounts.

    i. For Benabbas, approximately $518,000 was transferred to his personal accounts[24] listed above.  These funds were used to pay personal credit cards, home mortgages, as well as the purchases of vehicles as detailed below.  In addition there was approximately $207,000[25] in cash withdrawals during this time period.  Specifically from October 3, 2018, the day of his interview with KP Investigators, to October 9, 2018, approximately $62,140 was withdrawn from his personal accounts in 20 transactions, all under $10,000.  In addition, Benabbas withdrew $16,500 from the Epsilon Controls account ending in 0248 on October 9, 2018.

    ii. For Martinez, approximately $438,000 was transferred to his personal accounts listed above.  This includes a $40,000 transfer to U.S. Bank account ending in 1101 on October 2, 2018, the same day Martinez was interviewed by KP Investigators.  These funds were used to pay personal credit cards, home mortgages, as well as the purchases of vehicles as detailed below.  In addition there was approximately $90,000[26] in cash withdrawals during this time period.

b. During Martinez's interview with KP Investigators, Martinez stated that Epsilon Controls purchased BAS Control System parts from Relevant Solutions and Wilson-Mohr. During Benabbas' interview with KP Investigators, Benabbas stated Epsilon Controls purchased only 20 JACE controllers from Relevant Solutions/Wilson-Mohr.  Benabbas stated that he purchased the remaining JACE controllers outside of the established supply chain to include flea markets and through other off-market deals.  According to bank records for Epsilon Controls approximately $232,000 was paid to Wilson-Mohr/Relevant Solutions.  Other than the $24,183 paid to Electronic Mind, bank records did not show any other significant payments to BAS Control System vendors.

### BASIS FOR SEIZURE OF BANK ACCOUNTS AND VEHICLES

#### U.S. Bank account #103681420248 in the name of Epsilon Controls LLC

51. On July 19, 2018, KP paid KMG $184,000, via an ACH transaction in to Chase Bank

---

[23] This includes the $20,000 transaction in footnote 22.

[24] As noted in the bank account descriptions above, U.S. Bank account ending in 6043 is a joint account with Benabbas' wife Fatima Azmi.

[25] Benabbas also received his KP payroll deposits to his personal accounts.

[26] Martinez also received his KP payroll deposits to his personal accounts.

account ending in 4315 in the name of KMG, for invoice 12-092171[27]. On August 23, 2018, KMG paid Epsilon Controls $176,535, via check related to the KMG invoice 12-092171.  This check was deposited on the same day in to the operating account of Epsilon Controls, U.S. Bank account ending in 0248.

52. The balance in the U.S. Bank account in the name of Epsilon Controls ending in 0248 as of September 30, 2019 is $20,411.85.  With the exception of a same day $20,000 transfer in and out of the account by Benabbas and a debit purchase return for $42.76 to Target, there were no other deposits in to this account from August 23, 2018 through September 30, 2019.

53. Accordingly there is probable cause to believe that all funds in U.S. Bank account #103681420248 in the name of Epsilon Controls LLC are wire fraud proceeds and are subject to forfeiture.

### 2016 Chevrolet Corvette, VIN #1G1YY26U065124386

54. On April 23, 2015, Martinez purchased a 2016 Chevrolet Corvette, VIN #1G1YY26U065124386.

55. Prior to the purchase of the 2016 Chevrolet Corvette, a deposit was made into the operating account of Epsilon Controls, U.S. Bank account ending in 0248 dated February 20, 2015, in the amount of $143,500.00 from Ultra Temp.

56. On April 20, 2015 and April 21, 2015, transfers of $5,000.00 and $6,000.00, respectively, were made from Epsilon Controls, U.S. Bank account ending in 0248 to account ending in 1101, an account Robert Martinez has sole signatory authority over.

57. According to the title documents and financial records, the vehicle was purchased in the amount of $22,250.00 with a cashier's check dated April 23, 2015, issued by U.S. Bank funded by U.S. Bank account ending in 1101, an account  Robert Martinez has sole signatory authority over.

58. Accordingly, there is probable cause to believe that wire fraud proceeds were used to purchase the 2016 Chevrolet Corvette, VIN #1G1YY26U065124386.

### 2010 Chevrolet Avalanche, VIN #3GNVKGE06AG224170

59. On January 6, 2017, Martinez purchased a 2010 Chevrolet Avalanche, VIN #3GNVKGE06AG224170.

60. According to title documents and financial records, the 2010 Chevrolet Avalanche, VIN #3GNVKGE06AG224170 was purchased in the amount of $15,456.73.  The

---

[27] During an interview with KP Investigators, Garrett stated that invoice was a pass-through of Epsilon Controls charges.

vehicle was purchased using two credit cards, specifically, a U.S. Bank credit card number 4227 4485 6512 7438 (7438) and U.S. Bank credit card number 4359 8300 0263 7576 (7576), both in the name of Robert Martinez.  The first credit card charge was made January 6, 2017, in the amount of $8,100.00 on card 7438, and the second credit card charge was also made on January 6, 2017, in the amount of $8,000.00 on card 7576.

61. Several deposits into the operating account of Epsilon Controls, U.S. Bank account ending in 0248 were used to fund the purchase of the 2010 Chevrolet Avalanche. Specifically, three deposits totaling $741,875, dated September 29, 2016 ($121,250.00), October 21, 2016 ($30,625.00), and February 16, 2017 ($590,000.00), all from KMG.

62. On October 28, 2016, November 14, 2016, and February 28, 2017, there were transfers in the amounts of $23,999.38, $14,000.00 and $200,000.00, respectively, from Epsilon Controls, U.S. Bank account ending in 0248 to account ending in 1101, an account Robert Martinez has sole signatory authority over.

63. On January 20, 2017, a payment of $5,000.00 from U.S. Bank account ending in 1101 was made to U.S. Bank credit card 7438 in the name of Robert Martinez.

64. On January 20, 2017 and March 1, 2017, payments of $7,000.00 and $13,328.49, respectively, were made from U.S. Bank account ending in 1101 to U.S. Bank credit card 7576 in the name of Robert Martinez.

65. Accordingly, there is probable cause to believe that wire fraud proceeds were used to purchase the 2010 Chevrolet Avalanche, VIN #3GNVKGE06AG224170.

### 2016 Harley Davidson Motorcycle FLTRXS, VIN #1HD1KTM11GB638225

66. On April 22, 2017, Martinez purchased a 2016 FLTRXS Harley Davidson Motorcycle, VIN #1HD1KTM11GB638225.

67. Prior to the purchase of the 2016 Harley Davidson Motorcycle, a deposit was made into the operating account of Epsilon Controls, U.S. Bank account ending in 0248 dated February 16, 2017, for $590,000.00 from KMG.

68. On February 28, 2017, a transfer of $200,000.00 was made from Epsilon Controls, U.S. Bank account ending in 0248 to account ending in 1101, an account Robert Martinez has sole signatory authority over.

69. On April 14, 2017, a transfer of $25,000 using funds from the $200,000.00 transaction referenced above, was made from U.S. Bank account ending in 1101 to account ending in 5394 in the name of Robert Martinez.

70. According to the title documents and financial records, the vehicle was purchased in

the amount of $21,020.48 with a cashier's check in the amount of $26,879.90 issued on April 22, 2017 by U.S. Bank funded by U.S. Bank account ending in 5394 in the account name of Robert Martinez.

71. Accordingly, there is probable cause to believe that wire fraud proceeds were used to purchase the 2016 FLTRXS Harley Davidson Motorcycle, VIN #1HD1KTM11GB638225.

### 2016 Mercedes GLC Utility Passenger car, VIN #WDC0G4KBXGF051587

72. According to a Dealer's Bill of Sale and other car dealer paperwork dated August 22, 2018, Martinez purchased a 2016 Mercedes GLC Utility Passenger car, VIN #WDC0G4KBXGF051587.

73. Prior to the purchase of the 2016 Mercedes GLC, a deposit was made into the operating account of Epsilon Controls, U.S. Bank account ending in 0248 dated June 26, 2018, for $123,750.00 from KMG.

74. On August 23, 2018, a transfer of $40,000.00 was made from Epsilon Controls, U.S. Bank account ending in 0248 to account ending in 1101, an account Robert Martinez has sole signatory authority over.

75. According to the title documents and financial records, the vehicle was purchased in the amount of $35,171.00 with two U.S. Bank cashier's checks totaling $42,607.96. The first cashier's check was issued on August 23, 2018, in the amount of $11,022.92, made payable to Mercedes Benz of Denver and the second cashier's check was also dated August 23, 2018, in the amount of $31,585.04, made payable to Mercedes Benz of Denver. Both cashier's checks were funded by U.S. Bank account ending in 1101, an account Robert Martinez has sole signatory authority over.

76. Accordingly, there is probable cause to believe that wire fraud proceeds were used to purchase the 2016 Mercedes GLC Utility Passenger car, VIN #WDC0G4KBXGF051587

### 2016 Toyota Highlander, VIN #5TDJKRFH5GS232634

77. On December 28, 2016, Benabbas purchased a 2016 Toyota Highlander, VIN #5TDJKRFH5GS232634.

78. Prior to the purchase of the 2016 Toyota Highlander, a deposit was made into the operating account of Epsilon Controls, U.S. Bank account ending in 0248 dated September 29, 2016, for $121,250.00 from KMG.

79. On October 12, 2016, a transfer of $56,196.00 was made from Epsilon Controls, U.S. Bank account ending in 0248 to account ending in 0915 in the name of Wahid

Benabbas. These funds remained in the account through December 28, 2016.

80. According to the title documents and financial records, the vehicle was purchased with a counter transfer of funds on December 28, 2016 from U.S. Bank account ending in 0915 in the account name of Wahid Benabbas to a U.S. Bank account ending in 0300 in the name of City Center Auto in the amount of $31,510.00.

81. Accordingly, there is probable cause to believe that wire fraud proceeds were used to purchase the 2016 Toyota Highlander, VIN #5TDJKRFH5GS232634.

### 2017 Toyota RAV4, VIN #JTMDJREV1HD108249

82. On May 12, 2017, Benabbas purchased a 2017 Toyota RAV4, VIN #JTMDJREV1HD108249.

83. Prior to the purchase of the 2017 Toyota RAV4, a deposit was made into the operating account of Epsilon Controls, U.S. Bank account ending in 0248 dated February 16, 2017, for $590,000.00 from KMG.

84. On May 11, 2017 a transfer of $40,000 was made from Epsilon Controls, U.S. Bank account ending in 0248 to account ending in 6043 in the name of Wahid Benabbas and Fatima Azmi.

85. According to the title documents and financial records the vehicle was purchased on May 12, 2017, in the amount of $27,391.50 with check number 131 payable to Stevinson Toyota from U.S. Bank account ending in 6043 in the name of Wahid Benabbas and Fatima Azmi.

86. Accordingly, there is probable cause to believe that wire fraud proceeds were used to purchase the 2017 Toyota RAV4, VIN #JTMDJREV1HD108249.

87. On October 9, 2018, six days after Benabbas was interviewed by KP Investigators and put on administrative leave, Benabbas transferred title of the 2016 Toyota Highlander and the 2017 Toyota RAV4 to his wife Fatima Azmi.

### CONCLUSION

88. Based on the investigation described above, probable cause exists to believe that Martinez and Benabbas committed violations of Title 18 U.S.C. § 1343 (wire fraud), and conspiracy to commit wire fraud, in violation of Title 18 U.S.C. § 371.

89. Further, there is also probable cause to believe that Martinez and Benabbas used wire fraud proceeds to fund the account and purchase the vehicles listed below.

90. Title 18 U.S.C. § 981(a)(1)(C) provides for the civil forfeiture of any property constituting or derived from, proceeds traceable to any violation of 18 U.S.C. § 1343 (wire fraud), and conspiracy to commit wire fraud, in violation of Title 18 U.S.C. §

371.

91. Title 18 U.S.C. § 981(b), provides for the seizure of any assets subject to forfeiture pursuant to Title 18 U.S.C. § 981(a).

92. Accordingly, your Affiant seeks seizure warrants for the following property:

   a.  All funds in U.S. Bank account #103681420248 in the name of Epsilon Controls LLC

   b.  2016 Chevrolet Corvette, VIN #1G1YY26U065124386

   c.  2010 Chevrolet Avalanche, VIN #3GNVKGE06AG224170

   d.  2016 Harley Davidson Motorcycle FLTRXS, VIN #1HD1KTM11GB638225

   e.  2016 Mercedes GLC Utility Passenger Car, VIN #WDC0G4KBXGF051587

   f.  2016 Toyota Highlander, VIN #5TDJKRFH5GS232634

   g.  2017 Toyota RAV4, VIN #JTMDJREV1HD108249

I, Raul Leon, Special Agent with the Federal Bureau of Investigations, being duly sworn according to law, hereby state that the facts stated in the foregoing affidavit are true and correct to the best of my knowledge, information and belief.

s/ Raul Leon
Special Agent Raul Leon
Federal Bureau of Investigation

Reviewed and Submitted by Assistant United States Attorney Laura B. Hurd.

Subscribed and sworn to before me this __15th__ day of November 2019.

_Michael E. Hegarty_
UNITED STATES MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO